**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
PS US LLC, formerly known as                          :
PHARMASPECTRA, LLC,                                   :
                                                      :
           Plaintiff,                          :   Case No. 1:21-cv-1049-VEC
                                                      ::
- against -                                           :
                                                      :
JEREMY MOULDING,                                     :
                                                      :
           Defendant.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFF PS US LLC'S**
**<u>MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

    A.    Plaintiff's Business and Hiring of Moulding ............................................ 2

    B.    Moulding Engages in a Plot to Enrich Himself at Plaintiff's Expense ................. 3

    C.    Based Upon Moulding's Misconduct, Plaintiff Agrees to Sell Its Business .......... 4

    D.    Moulding Admits His Conflict of Interest After His Misconduct is Revealed ....... 6

ARGUMENT ................................................................................................... 7

I.     PLAINTIFF HAS STANDING TO BRING THESE CLAIMS ........................................ 8

    A.    Plaintiff Has Standing to Bring Claims Based on Moulding's Misconduct .......... 8

    B.    Plaintiff Has Alleged an Actual, Justiciable Controversy in Count VIII ............. 11

II.    NEW YORK IS THE PROPER FORUM FOR PLAINTIFF'S CLAIMS ....................... 12

III.   MOULDING IS THE ONLY PARTY NECESSARY TO THIS ACTION .................... 13

IV.   PLAINTIFF HAS STATUTORY AUTHORITY TO MAINTAIN THIS ACTION ....... 16

V.    PLAINTIFF HAS ADEQUATELY STATED EACH CAUSE OF ACTION ................ 17

    A.    Plaintiff Has Adequately Pled a Breach of Contract Claim ................................. 17

        1.    The Confidential Settlement Agreement And BPA Have  no Bearing
            on Plaintiff's Claim ............................................................................. 17

        2.    Plaintiff Has Pled All of the Essential Elements of Its Claim ................. 20

    B.    Plaintiff Has Adequately Pled a Breach of Fiduciary Duty Claim ...................... 21

    C.    Plaintiff Has Adequately Pled an Unjust Enrichment Claim ............................... 24

    D.    Plaintiff Has Pled Its Fraud Claims With The Requisite Particularity ................ 25

    E.    Plaintiff Has Adequately Pled a Civil Conspiracy Claim .................................... 27

    F.    Plaintiff Has Adequately Pled Tortious Interference Claims .............................. 29

CONCLUSION .................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alpine Group, Inc. v. Johnson*,
  2002 WL 10495 (S.D.N.Y. Jan. 3, 2002) ............................................22

*Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*,
  795 F.3d 351 (2d Cir. 2015)...............................................................14

*Analisis y Estrategia, S.A. de C.V. v. Andersen*,
  2015 WL 4510772 (S.D.N.Y. July 24, 2015) ......................................14

*Basile v. Mulholland*,
  73 A.D.3d 597 (1st Dep't 2010) .........................................................17

*Bodner v. Banque Paribas*,
  114 F. Supp. 2d 117 (E.D.N.Y. 2000) ................................................14

*Brown Media Corp. v. K & L Gates, LLP*,
  586 B.R. 508 (E.D.N.Y. 2018) ...........................................................29

*Cal. Pub. Emples. Ret. Sys. v. Shearman & Sterling*,
  95 N.Y.2d 427 (2000) ...........................................................................9

*CBS Corp. v. Dumsday*,
  268 A.D.2d 350 (1st Dep't 2000) .......................................................23

*CMG Holdings Group v. Wagner*,
  2016 WL 4688865 (S.D.N.Y. Sept. 7, 2016).......................................20

*Commonwealth of Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan
  Stanley & Co.*,
  25 N.Y.3d 543 (2015) .............................................................................8

*DeDalle v. A.G. Edwards & Sons, Inc.*,
  804 F. Supp. 436 (D. Conn. 1992).......................................................27

*Dexia SA/NV v Morgan Stanley*,
  2013 WL 5663259 (N.Y. Sup. Ct. Oct. 16, 2013) ................................9

*Diamond State Ins. Co. v. Worldwide Weather Trading LLC*,
  2002 WL 31819217 (S.D.N.Y. Dec. 16, 2002) ...................................28

*Digizip.com v. Verizon Services Corp.*,
  2015 WL 1283676 (S.D.N.Y. Mar. 20, 2015) ...............................10, 11

*ESI, Inc. v. Coastal Corp.*,
    61 F. Supp. 2d 35 (S.D.N.Y. 1999) ............................................................10

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)..................................................................26

*Food Holdings, Ltd. V. Bank of Am. Corp.*,
    477 F. Supp. 2d 602 (S.D.N.Y. 2007)......................................................28

*Fox v. Hirschfeld*,
    157 A.D. 364 (1st Dep't 1913) ............................................................8, 9

*G.V. Trademark Invs., Ltd. v. Gemini Shirtmakers, Inc.*,
    1999 WL 61808 (S.D.N.Y. Feb. 10, 1999)......................................... 18-19

*Gladsky v. Frank Scobbo Contractors, Inc.*,
    2017 WL 3731323 (E.D.N.Y. Aug. 29, 2017)........................................24

*Gov't Emples. Ins. Co. v. Damien*,
    2011 WL 5976071 (E.D.N.Y. Nov. 3, 2011).........................................25

*Halley v. Ohio Co.*,
    107 Ohio App. 3d 518 (Oh. Ct. App. 1995) .........................................12

*Health-Chem Corp. v. Baker*,
    915 F.2d 805 (2d Cir. 1990)................................................................19

*Jefferson Bus. Interiors, LLC v. East Side Pharmacy, Inc.*,
    2016 WL 164043 (N.Y. Sup. Ct. Jan. 8, 2016)................................ 16-17

*Johnson v. Nextel Communs., Inc.*,
    660 F.3d 131 (2d Cir. 2011)................................................................22

*JPMorgan Chase Bank, N.A v. IDW Group, LLC*,
    2009 WL 321222 (S.D.N.Y. Feb. 9, 2009)...........................................23

*Kraus USA, Inc. v. Magarik*,
    2020 WL 2415670 (S.D.N.Y. May 12, 2020) .......................................22

*Kulick v. Gamma Real Estate LLC*,
    2021 WL 918555 (S.D.N.Y. Mar. 10, 2021) ........................................23

*Labajo v. Best Buy Stores, L.P.*,
    478 F. Supp. 2d 523 (S.D.N.Y. 2007).............................................. 24-25

*Littlejohn v. City of New York*,
    795 F.3d 297 (2d Cir. 2015)..................................................................8

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
  2014 WL 2931398 (E.D.N.Y. June 27, 2014) .......................................................28

*Madelblatt v. Devon Stores*,
  132 A.D.2d 162 (1st Dep't 1987) .......................................................................23

*Manhattan Fuel Co. v. New England Petroleum Corp.*,
  422 F. 797 (S.D.N.Y. 1976).............................................................................17

*Mercator Corp. v. Windhorst*,
  159 F. Supp. 3d 463 (S.D.N.Y. 2016).............................................................. 20-21

*Metropolitan Life Ins. Co. v. Nobel Lowndes Int'l*,
  84 N.Y.2d 430 (1994) .....................................................................................10

*Minnie Rose LLC v. Yu*,
  169 F. Supp. 3d 504 (S.D.N.Y. 2016)...............................................................26

*Pappas v. Philip Morris, Inc.*,
  915 F.3d 889 (2d Cir. 2019)................................................................................8

*Pc Specialists v. Micros Sys.*,
  2010 WL 11509024 (S.D. Cal. Apr. 27, 2010).....................................................15

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
  712 F.3d 705 (2d Cir. 2013)................................................................................7

*Peregrine Myanmar v. Segal*,
  89 F.3d 41 (2d Cir. 1996)............................................................................14, 15

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
  460 F. Supp. 3d 481 (S.D.N.Y. 2020)................................................................26

*Rana v. Islam*,
  305 F.R.D. 53 (S.D.N.Y. 2015) .........................................................................26

*Scottsdale Ins. Company v. Jian Li Structure, Inc.*,
  2020 WL 5622201 (E.D. N.Y. Aug. 28, 2020).....................................................12

*Shtofmakher v. David*,
  2015 WL 5148832 (S.D.N.Y. Aug. 17, 2015) ......................................................14

*Singer v. Xipto Inc.*,
  852 F. Supp. 2d 416 (S.D.N.Y. 2012).................................................................24

*Super Am. Tissue, Inc. v. Global Equip. & Mach. Sales, Inc.*,
  2019 WL 6211709 (S.D.N.Y. Nov. 21, 2019) ......................................................17

*Tucker v. Chase Bank USA, N.A.*,
399 F. Supp. 3d 105 (S.D.N.Y. 2019)......................................................................10

*Tycon I Inv. Ltd. P'ship v. John Burgee Architects*,
234 A.D.2d 748 (3d Dep't 1996) .............................................................................9

*Varbero v. Belesis*,
2020 WL 5849516 (S.D.N.Y. Oct. 1, 2020) ..........................................................28

*Vlachos v. Thomas*,
2018 WL 3158515 (N.Y. Sup. Ct. June 28, 2018)..................................................25

*Walker v. Inter-Americas Ins. Corp.*,
2004 WL 1620790 (N.D. Tx. July 19, 2004)..........................................................15

*Weinraub v. Int'l Banknote Co.*,
422 F. Supp. 856 (S.D.N.Y. 1976) .........................................................................20

*William C. Atwater & Co. v. Panama R. Co.*,
246 N.Y. 519 (1927) ..............................................................................................18

*Yukos Cap. S.A.R.L. v. Feldman*,
977 F.3d 216 (2d Cir. 2020).....................................................................................24

*Zurich American Life Insurance Co. v. Nagel*,
2021 WL 2021 WL 1877364 (S.D.N.Y. May 11, 2021) ........................................23

**Statutes**

N.Y. Limited Liability Company Law § 808.........................................................16, 17

**Other Authorities**

Fed. R. Civ. P. 8..............................................................................................22, 23, 28

Fed. R. Civ. P. 9.......................................................................................................26

Fed. R. Civ. P. 19..........................................................................................13, 14, 15, 16

Plaintiff PS US LLC respectfully submits this memorandum of law in opposition to defendant Jeremy Moulding's motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

Moulding's motion seeks to dismiss *a* complaint, just not *the* Complaint that Plaintiff actually filed in this action. Moulding even sought leave to file an oversized moving brief, only to spend his extra pages discussing contracts under which Plaintiff is not asserting claims, while ignoring the actual allegations of the Complaint. Despite the length of Moulding's motion papers and his efforts to confuse, the issues presented here are simple.

Moulding was Plaintiff's CEO pursuant to an employment agreement (the "Employment Agreement"). In breach of that agreement and his fiduciary duties, Moulding engaged in self-dealing, fraud, and other misconduct in order to induce Plaintiff to sell its business to Inflexion Group L.P. ("Inflexion") on terms detrimental to Plaintiff (the "Inflexion Sale"). Moulding did so because he cut a deal to obtain lucrative employment with Inflexion following the sale.

Moulding's primary argument is that when he misled Plaintiff into entering into the Inflexion Sale, he also duped Plaintiff into assigning away its right to sue him based on his (then-unknown) misconduct. According to Moulding, only the assignee, the business acquired by Inflexion *for which Moulding himself now serves as CEO*, can bring suit on these claims. Put more simply, Moulding's argument is: Yes, I tricked Plaintiff, but I was so successful in tricking Plaintiff that only the company I run can bring claims against me. This argument – ludicrous on its face – is contradicted by both the law and the facts.

Moulding also spends much of his motion arguing that (i) this case should be heard in the United Kingdom because the contract providing for the Inflexion Sale has a U.K. forum selection clause, and (ii) Inflexion, its affiliate Pharmaspectra, and the United Kingdom tax authority (the "UK Tax Authority") are necessary parties to this action. These are frivolous arguments.

Whatever forum selection clause may exist in the Inflexion Sale contract is irrelevant to Plaintiff's claims under the Employment Agreement, which chooses a New York forum and expressly waives all objections to venue here.  And, there are no other parties necessary to this action, which asserts claims against Moulding and only Moulding.

Moulding's diversionary arguments are aimed at obscuring the fact that Plaintiff's claims are well pled and set forth a clear scheme by which Moulding betrayed Plaintiff for his own personal benefit.  Accordingly, even if the imaginary multi-party, multi-contract complaint that is the subject of Moulding's motion were ripe for dismissal, the actual complaint filed by Plaintiff against Moulding under his Employment Agreement is not.  Moulding's motion should be denied.

## STATEMENT OF FACTS

The facts are set forth in the Complaint (Dkt. No. 25), and are presumed to be true on this motion.  Below, Plaintiff summarizes the facts relevant to this motion.

### A.     Plaintiff's Business and Hiring of Moulding

Plaintiff was a global provider of medical affairs data to the pharmaceutical and biotech industry.  (Compl. ¶¶ 13-14).   In September 2018, Moulding entered into the Employment Agreement and became Plaintiff's CEO.  (Compl. Ex. A).  Among other things, the Employment Agreement provided that Moulding:

> Hereby irrevocably and unconditionally agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York

(Compl. Ex. A § 13(d)(i)).

Moulding further agreed that he:

> irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement, brought in the courts of the State of New York or in the United States District Court for the Southern District

of New York, and any claim that any such action, suit or proceeding brought in any
such court has been brought in an inconvenient forum

(*Id.* § 13(d)(ii)).

The Employment Agreement prohibited Moulding from "any conduct that is injurious to
the Company" and disclosing confidential information.  (Compl. Ex. A at §§ 4(c)(iii), 6, 7).

Moulding joined Plaintiff with an agreement to split his time equally between the United
States and the United Kingdom.  (Compl. ¶ 33).  Moulding became dissatisfied with this
arrangement, however, and attempted to persuade Plaintiff into creating a United Kingdom entity,
which Plaintiff declined to do.  (*Id.* ¶¶ 34-38).  Moulding created the United Kingdom entity
anyway, to Plaintiff's eventual detriment.  (*Id.* ¶ 38).

### B.    Moulding Engages in a Plot to Enrich Himself at Plaintiff's Expense

In early 2019, Plaintiff was receiving interest from third parties in a minority investment.
Four venture capital firms – Silversmith Capital, Spectrum, Summit Partners, and Bridgepoint –
expressed the strongest interest in a transaction.  (Compl. ¶¶ 39-41).  But Moulding had other ideas.
Unbeknownst to Plaintiff, Moulding negotiated an under-the-table deal with Inflexion so that he
could secure a full-time U.K.-based position with Inflexion or its affiliate following a sale of
Plaintiff's business to Inflexion.  (*Id.* ¶¶ 44, 56).  Plaintiff alleges that Moulding's deal with
Inflexion tied his equity in the post-purchase business to his ability to achieve a deal for Inflexion
on terms that benefited Inflexion at Plaintiff's expense.  (*Id.* ¶ 76).

Moulding therefore engaged in a series of actions to ensure that Plaintiff would enter into
a transaction favorable to Inflexion, at Plaintiff's expense.  In February and March 2019, Moulding
told Plaintiff in New York, mostly by telephone but also in person, that Plaintiff should enter into
a transaction with Inflexion because of its ability to quickly close on the deal, including because it
had significant cash available and did not need to raise funds, and because Inflexion was a good

fit for Plaintiff.  (Compl. ¶ 48).  These factors were important considerations to Plaintiff.  (*Id.* ¶ 49).  Yet Moulding knew, based on his discussions with Inflexion, that these statements were false at the time he made them.  (*Id.* ¶ 50).  During this same period, Moulding began feeding confidential information to Inflexion regarding Plaintiff's finances, strategies for negotiating certain points of the deal, and potential new business ventures unrelated to Plaintiff's existing business, all to give Inflexion the upper hand in its negotiations with Plaintiff.  (Compl. ¶¶ 52-56).

After Inflexion sent Plaintiff a letter of intent, Moulding represented to Plaintiff, in telephone and in-person discussions with Plaintiff in New York between on or about March 26, 2019 and early April 2019, that Inflexion was the highest bidder for the contemplated transaction because it was offering $100 million, the offer was not contingent on any future profits, forecasts, or earnings, and that Inflexion was trustworthy and good fit for Plaintiff in the transaction.  (Compl. ¶ 62).  Moulding knew these statements were false when he made them.  (*Id.* ¶ 63).

Moulding continued to make false statements to Plaintiff to persuade it to enter into the deal with Inflexion.  In particular, in communications in-person and via telephone to Plaintiff in New York in late March 2019 and early April 2019, Moulding stated that Inflexion would be able to conduct a quick and efficient due diligence process, and would be able to close the transaction within five weeks of executing the letter of intent.  (Compl. ¶ 67).  Moulding knew these statements were false, but he made them anyway to induce Plaintiff to enter into the Inflexion Sale.  (*Id.* ¶ 68).

**C.**     **Based Upon Moulding's Misconduct, Plaintiff Agrees to Sell Its Business**

Moulding's plan worked.  Based on the trust Plaintiff placed in Moulding as its CEO, and in reliance on his representations, in April 2019, Plaintiff agreed to proceed with the Inflexion Sale.  (Compl. ¶ 69).  Inflexion then repeatedly extended the due diligence period well beyond the time period Moulding had promised.  (*Id.* ¶¶ 70-72, 77-83).  All the while, Moulding continued to feed Inflexion confidential information to bolster Inflexion's negotiating position.  (*Id.* ¶¶ 73-76).

In August or September 2019, Inflexion abruptly dropped its offer to purchase Plaintiff's business to $52 million, plus a potential earn-out that would be based on 2019 and 2020 revenue. (Compl. ¶¶ 84-85).  To convince Plaintiff to stick with the Inflexion Sale despite this change in the deal structure, Moulding continued to make misrepresentations to Plaintiff.  In particular, Moulding made representations to Plaintiff in-person and via telephone in or about August 2019 about the performance of the company and its ability to hit revenue targets in 2019, stating that based on current numbers, it would have no trouble hitting revenue targets and achieving its earn-out.  (*Id.* ¶¶ 86-87).  Defendant knew these statements were false when he made them based on his discussions with Inflexion, and his knowledge of Plaintiff's business and finances.  (*Id.* ¶ 88).

In reliance on Moulding's misrepresentations, Plaintiff agreed to this revised transaction structure and the parties moved forward.  (Compl. ¶ 90).  Moulding continued to work with Inflexion to structure the deal to Inflexion's benefit, at Plaintiff's expense, and continued to make misrepresentations to Plaintiff even days before the closing in October 2019 to ensure that Plaintiff stuck with the transaction.  (*Id.* ¶¶ 91-93).

On October 4, 2019, Plaintiff and Inflexion, through a new entity created by Inflexion, Pharmaspectra Group Ltd. ("Pharmaspectra"), entered into the Business Purchase Agreement ("BPA") and Asset Purchase Agreement ("APA").  (Dkt. No. 30-1 Exs. A-B).  As part of the BPA and APA, Plaintiff agreed to sell to Inflexion (via Pharmaspectra) "(i) the Business as a going concern and (ii) the Assets as at, and with effect from, the Transfer Time. . . ."  (BPA, Dkt. No. 30-1 Ex. A § 2.1).

The "Business" was defined in the BPA as "the business of collating, quantifying and/or analysing medical data and literature in connection with the provision of the Products, services and solutions to the healthcare sector as carried on by the Sellers at the Transfer Time."  (*Id.* § 1.1,

definition of "Business").  "Assets," in turn, were defined as follows:

> 2.2.1 the Goodwill;
> 2.2.2 the Plant and Machinery;
> 2.2.3 the Fixtures and Fittings;
> 2.2.4 the benefit (subject to the burden) of the Contracts;
> 2.2.5 the Intellectual Property Rights;
> 2.2.6 the IT System;
> 2.2.7 the benefit of all Claims;
> 2.2.8 the Records;
> 2.2.9 all other assets, property or rights of the Sellers which are used in or relate
> to the Business as at the Transfer Time.

(*Id.* § 2.2).  "Claims" were defined as "the benefit of all rights and claims which the Sellers have against *third parties* relating to the Assets and the Business, including, but not limited to, all manufacturers' and suppliers' warranties and representations and all rights against insurers in respect of any policies effected by the Sellers in connection with the Assets and the Business."  (*Id.* § 1.1, definition of "Claims") (emphasis added).

Because Moulding would no longer be employed by Plaintiff following the Inflexion Sale, Plaintiff also agreed to terminate Moulding's obligations to Plaintiff under the Employment Agreement, pursuant to a Confidential Settlement Agreement.  (Compl. ¶ 98; Cohen Decl. Ex. A). In the Confidential Settlement Agreement, Moulding confirmed that he had been paid a certain amount, and released all claims against Plaintiff.  (Dkt. No. 30-1 Ex. B at §§ 2 and 6 and Ex. A). The Confidential Settlement Agreement did not include any release of claims by Plaintiff in favor of Moulding, or otherwise contain any waiver of Plaintiff's claims for pre-existing breaches of the Employment Agreement.  (*See id.*; *see also* Compl. ¶¶ 98-99).

### D.   Moulding Admits His Conflict of Interest After His Misconduct is Revealed.

A few days after the closing of the Inflexion Sale, Moulding, now installed by Inflexion as the CEO of Pharmaspectra, revealed that he had misrepresented the revenue figures to Plaintiff as part of his pre-closing representations to lure Plaintiff into the deal.  (Compl. ¶¶ 101-02).  The

revenue figures Moulding suddenly reported were much lower, to ensure that the earn-out targets in the sale transaction could not be met, thereby reducing the consideration paid to Plaintiff for the Inflexion Sale.  (*See id.*)  Moulding then worked with Inflexion to stymie efforts by Plaintiff to bring in new contracts that would help Inflexion achieve the revenue needed to meet the earn-out targets.  (*See id.* ¶¶ 103-13).  On October 30, 2019, Moulding admitted that he had a conflict of interest and withdrew from Plaintiff's negotiations with Inflexion.  (*Id.* ¶ 114).

Moulding's misrepresentations and other misconduct had effects beyond the earn-out. First, Plaintiff had paid to Moulding a discretionary "Equity Incentive Payment" of $2,625,923.00. (Compl. ¶ 116).  Plaintiff was not obligated to make this payment, and did so based on Moulding's misrepresentations about Plaintiff's revenues and the ability of Plaintiff's business to meet the earn-out targets.  (*Id.* ¶¶ 117-24).  Based upon the actual revenue amounts, Moulding was overpaid by $1,135,833.97.  (*Id.* ¶ 125).

Second, Moulding's creation of a United Kingdom entity without Plaintiff's approval has caused a tax liability of at least $509,002.85.  (Compl. ¶¶ 190-94).  Although the Employment Agreement required Moulding to pay this tax liability, he has refused to do so.  (*Id.* ¶¶ 188-96). Plaintiff is facing the imminent risk that the UK Tax Authority will seek payment of the $509,002.85 from Plaintiff as a result of Moulding's misconduct.  (*Id.* ¶¶ 197-201).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In considering a motion to dismiss, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).  As shown

below, Plaintiff's Complaint is well-pled under these standards and New York law.[1]

## I.    PLAINTIFF HAS STANDING TO BRING THESE CLAIMS

Moulding's primary argument is that, as part of the BPA and APA, Plaintiff assigned its

rights to pursue claims against Moulding to Inflexion and Pharmaspectra.  (Moulding Br. 13-18).

This extraordinary argument has no basis in fact or law, and should be rejected.

### A.    Plaintiff Has Standing to Bring Claims Based on Moulding's Misconduct

As even Moulding's cited cases hold, under New York law, "the right to assert a fraud

claim related to a contract or note does not automatically transfer with the respective contract or

note.  Thus, where an assignment of fraud or other tort claims is intended in conjunction with the

conveyance of a contract or note, there must be some language—although no specific words are

required—that evinces that intent and effectuates the transfer of such rights."  *Commonwealth of*

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 25 N.Y.3d 543, 550 (2015).

New York courts have consistently applied this principle for more than a century.  For

example, in *Fox v. Hirschfeld*, 157 A.D. 364 (1st Dep't 1913), the court held that:

> It is manifest that the plaintiff did not intend to assign the cause of action for
> damages to his wife, *because neither at the time of the assignment, nor of the*
> *execution of the conveyance, had the plaintiff discovered the fraud*.  The cause of
> action was, of course, assignable; but the language employed in the assignment of
> the contract was not appropriate to assign a cause of action arising, not under the
> contract, but for the fraudulent representations of the defendant *dehors* the contract.

*Id.* at 368 (emphasis added).  *See also Cal. Pub. Emples. Ret. Sys. v. Shearman & Sterling*, 95

N.Y.2d 427, 435-36 (2000) ("The Omnibus Assignment refers only to rights and interests under

the loan documents . . . .  The assignment did not include a cause of action arising outside the loan

---

[1] Because the Court's jurisdiction is based upon diversity jurisdiction, New York state substantive
law applies to this action.  *Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 893 (2d Cir. 2019) ("as a
general matter, a federal district court sitting in diversity jurisdiction must apply the substantive
law of the state in which it sits").  The Employment Agreement also contains a New York choice
of law provision.  (Compl. Ex. A § 13(c)).

documents themselves"); *Tycon I Inv. Ltd. P'ship v. John Burgee Architects*, 234 A.D.2d 748, 749 (3d Dep't 1996) ("an assignment of whatever contractual rights AEW had with Burgee . . . would not include an assignment of AEW's claims for fraud or negligent misrepresentation without express language to that effect in the assignment"); *Dexia SA/NV v Morgan Stanley*, 2013 WL 5663259, at *4 (N.Y. Sup. Ct. Oct. 16, 2013) ("[i]t is unclear how [assignor] could have intended to convey fraud claims of which it was not aware"). As in *Fox* and *Dexia*, it is unclear how Plaintiff could have intended to assign tort claims of which it was not aware at the time of the assignment, and which were not expressly assigned. (*See* Compl. ¶ 96).

Moulding nonetheless argues that the Court should infer that Plaintiff intended to assign its then-unknown tort claims and claims under the Employment Agreement because Plaintiff generically assigned "Claims" in the BPA and "Claims" was "broadly defined." (Moulding Br. at 17-18). That is simply not correct. The "Claims" assigned under the BPA consist of :

> [T]he benefit of all rights and claims which the Sellers have against *third parties* relating to the Assets and the Business, including, but not limited to, *all manufacturers' and suppliers' warranties and representations and all rights against insurers in respect of any policies effected by the Sellers in connection with the Assets and the Business.*

(BPA, Dkt. No. 30-1 Ex. A § 1.1. p.3 (emphasis added)). This is *not* a "broad" assignment of all known and unknown claims that would include fraud and contract claims against Moulding.

First, it applies only to claims against "third parties" such as manufacturers and suppliers. Moulding was not a "third party." He was Plaintiff's CEO.

Second, the illustrative examples of the "Claims" assigned under the BPA, such as manufacturers' and suppliers' warranties, confirm that the assigned claims are limited to third party claims against vendors and other counterparties, not then-unknown tort claims and claims for breach of contract against a high-level executive. *See ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 75 (S.D.N.Y. 1999) ("The phrase 'including, but not limited to' does not alter this analysis

- the general expression is not limited to the single specific example given, but should nevertheless be restricted to obligations of the same type or class"); *see also Tucker v. Chase Bank USA, N.A.*, 399 F. Supp. 3d 105, 113 (S.D.N.Y. 2019) ("where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned" (internal quotation marks omitted)); *Metropolitan Life Ins. Co. v. Nobel Lowndes Int'l*, 84 N.Y.2d 430, 438 (1994) ("Under the interpretation tool of *ejusdem generis* applicable to contracts" a phrase "should be interpreted . . . as referring to conduct similar in nature to the" phrases "with which it was joined").

Third, this conclusion is further buttressed by the fact that "Claims" are defined in the BPA to include only rights and claims "relating to the Assets and the Business." (BPA, Dkt. No. 30-1 Ex. A § 1.1. p.3). The "Business" is defined as "business of collating, quantifying and/or analysing medical data and literature in connection with the provision of the Products, services and solutions to the healthcare sector," while the "Assets" are defined as things like "Goodwill" and "Fixtures and Fittings." (*Id.* §§ 1.1, 2.2). Moulding's misconduct was not part of the "Business" or related to those "Assets" – it was unauthorized conduct that violated the law and Moulding's obligations under his Employment Agreement.

To try to salvage his argument, Moulding relies almost exclusively on a single decision, *Digizip.com v. Verizon Services Corp.*, 2015 WL 1283676 (S.D.N.Y. Mar. 20, 2015), which he asserts "is nearly identical" to this case. (Moulding Br. at 17). Even a cursory review reveals that there is nothing remotely identical about this case and *Digizip*. In *Digizip*, Digizip had a vendor contract with Verizon. Digizip sold its business to an entity called WCS and assigned all "accrued, contingent or other" assets. *Id.* at *3. Two years after the assignment, Digizip discovered that

Verizon had overcharged it for certain services prior to the sale to WCS and brought suit.  Verizon moved to dismiss for lack of standing based on Digizip's assignment of accrued, contingent, or other assets to WCS.  The court granted Verizon's motion.

Here, then, is how the facts of these "nearly identical" cases stack up:

- In *Digizip*, the asset sale agreement transferred *all* claims.  Conversely, the BPA invoked by Moulding transferred only *third party* claims.

- In *Digizip*, the plaintiff brought a post-merger claim against a third-party vendor for pre-merger overcharges.  Conversely, Plaintiff here has brought a post-merger claim against its own CEO for breaches of contractual and common law duties in connection with the merger itself.

These two distinctions alone dispel Moulding's argument, and leave him asking the Court to find as a matter of law at the pleading stage that Plaintiff intended to assign then-unknown claims against Moulding for luring Plaintiff into that very assignment, in the absence of any contractual language indicating an intent to assign such claims, and in reliance upon a case that is the direct opposite of this one.  Moulding's argument should be rejected.

### B.       Plaintiff Has Alleged an Actual, Justiciable Controversy in Count VIII

Moulding also argues that although Plaintiff alleged that there is a dispute between the parties about which of them is required to pay an "unsatisfied tax claim in the amount of $509,002.85" in the United Kingdom (Compl. ¶ 202), Plaintiff did not allege an "actual, justiciable" controversy between the parties.  (Moulding Br. 19).  Moulding is wrong.

Moulding's claim that Plaintiff "has not alleged why the tax is owed, that it actually paid the alleged tax claim, or that any liability for the tax claim has been imposed upon it, such that there would be anything to indemnify" simply ignores the allegations of the Complaint.  The Complaint alleges that there is an actual, non-contingent tax liability of at least $509,0002.85 as a result of Moulding's work in the United Kingdom and his unauthorized formation of a Pharmaspectra entity there.  (Compl. ¶¶ 188-201).

In the case relied upon by Moulding, *Scottsdale Ins. Company v. Jian Li Structure, Inc.*, 2020 WL 5622201 (E.D. N.Y. Aug. 28, 2020), the court rejected a declaratory judgment claim brought by an insurer largely because the insurer was seeking a declaratory judgment about a "dispute" that would only arise if a dissolved, non-existent entity was sued and lost, and that dissolved, non-existent entity then sued the insurer. *Id.* at *6. Here, there is an imminent risk that the UK Tax Authority, which is not a non-existent entity, will require Plaintiff, also not a non-existent entity, to pay amounts that Plaintiff contends should be paid by Moulding, but Moulding disputes that obligation. (Compl. ¶¶ 188-201).

Moreover, *Scottsdale* and the cases it relied upon involved indemnification for potential litigation-related claims that were contingent on the outcome of anticipated or pending civil litigation. *Scottsdale*, 2020 WL 5622201, at *5-8. That is not the case here, where the tax liability exists and is not contingent. Other courts have found that even where tax liability "is dependent upon whether the [taxing authority] conducts an audit and rules unfavorably to appellants . . . [t]he controversy is not so speculative as to deny declaratory relief." *Halley v. Ohio Co.*, 107 Ohio App. 3d 518, 524-26 (Oh. Ct. App. 1995).

Plaintiffs have alleged that Moulding created a tax liability of at least $509,0002.85, that he has refused to pay that amount (or even acknowledge his obligation to do so), and that there is an imminent risk of action by the UK Tax Authority against Plaintiff. (Compl. ¶¶ 188-201). There is an actual, justiciable controversy here (unless, of course, Moulding concedes his obligation to pay the tax liability).

## II.    **NEW YORK IS THE PROPER FORUM FOR PLAINTIFF'S CLAIMS**

Moulding spends seven of his 45 pages arguing that New York is an improper forum for this action because the BPA and APA have England and Wales forum selection clauses (Moulding Br. 22 (quoting BPA, Dkt. No. 30-1 Ex. A § 28.2)). This argument is frivolous (though emblematic

of Moulding's motion as a whole), and can be answered in two sentences:

Plaintiff sued Moulding under his Employment Agreement, not the BPA. The Employment Agreement has a New York forum selection clause and Moulding's waiver of objections to venue in this Court. (Compl. Ex. A § 13(d)).[2]

## III.  MOULDING IS THE ONLY PARTY NECESSARY TO THIS ACTION

In an effort to manufacture another ground for dismissal, Moulding asserts that Plaintiff failed to join three necessary parties: Inflexion, Pharmaspectra, and the UK Tax Authority. (Moulding Br. at 26-30).  This is another frivolous argument.

Federal Rule of Civil Procedure 19 provides that a non-party "who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" is a necessary party under two circumstances.  First, if "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19(a)(1)(A).  Second, if "that [non-party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B). Under Rule 19, "[f]ederal courts are extremely reluctant to grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result."  *Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*, 795 F.3d 351, 357 (2d Cir. 2015) (internal quotation marks omitted).

---

[2] Ironically, much of Moulding's argument on this point is devoted to authority concerning the enforceability of forum selection clauses like that in the Employment Agreement. (Moulding Br. 20-23).  His forum argument on this motion is truly baffling.

Moulding's motion fails under the first prong of Rule 19 because the Court can, of course, afford complete relief on Plaintiff's claims against Moulding by entering judgment solely against him. Entities that are non-parties to the contract under which the plaintiff is suing are not necessary parties, and neither are co-conspirators or even co-tortfeasors, to the extent Moulding is trying to say that Inflexion or Pharmaspectra have committed wrongs against Plaintiff. *Peregrine Myanmar v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) ("A nonparty to a commercial contract ordinarily is not a necessary party to an adjudication of rights under the contract") (internal quotation marks omitted); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 136 (E.D.N.Y. 2000) ("it is well established federal law that neither joint tortfeasors nor co-conspirators are indispensable parties"). Moreover, because Plaintiff is only seeking damages and, in one instance, a declaration of Moulding's tax-related obligations to Plaintiff, the Court can afford complete relief against Moulding only. (Compl. ¶¶ 3, 44-56, 62-63, 67-69, 73-77, 86-91, 129); *Shtofmakher v. David*, 2015 WL 5148832, at *7 (S.D.N.Y. Aug. 17, 2015) ("Plaintiff seeks only monetary damages, and Defendants do not explain why the relief sought could not be obtained without the absent parties' presence").

Moulding's motion also fails under the second prong of Rule 19. With respect to Inflexion and Pharmaspectra, Moulding again moves against a complaint that has not been filed. He continues to assert that the Court will have to interpret the BPA to decide this case. It will not. This case is about Moulding's breach of his Employment Agreement and common law duties to Plaintiff. Once again, Moulding's own authority defeats him: In *Vision en Analisis y Estrategia, S.A. de C.V. v. Andersen*, 2015 WL 4510772 (S.D.N.Y. July 24, 2015), the plaintiff's allegations made clear that the indispensable parties' "conduct is largely the focus of the litigation," and one of the indispensable parties was "a named party to a contract in dispute." *Id.* at *5-6. Here, in contrast, it is Moulding's conduct alone that is the focus of the litigation (Compl. ¶¶ 44-56, 62-63,

67-69, 73-77, 86-91), and neither Inflexion nor Pharmaspectra are named parties to the only contract in dispute, the Employment Agreement.  (Compl. Ex. A).

Nor can Moulding manufacture a "necessary party" defense by frivolously invoking or relying upon the BPA and APA, to which he is not a party, in the hopes of obtaining dismissal.  *See, e.g., Pc Specialists v. Micros Sys.*, 2010 WL 11509024, at *2-3 (S.D. Cal. Apr. 27, 2010) ("Since Defendant is not a signatory to or assignee of the licensing agreement, it is not clear how that agreement is relevant to acts done by Defendant as opposed to those by [the purported necessary party] . . . .  Defendant has failed to show that [non-party] is a necessary party based on the assertion that the agreement must be interpreted by the Court"); *Walker v. Inter-Americas Ins. Corp.*, 2004 WL 1620790, at *4 (N.D. Tx. July 19, 2004) (Plaintiffs' "submissions make clear that they wish to recover from IAI.  Because they do not currently wish to sue OODIA . . . [Plaintiffs'] action should not be interpreted to invoke the forum-selection clause in the" contract with OODIA, and thus "OOIDA is not a necessary party").

But even if all of that were not so, the Federal Rules only permit consideration of whether Inflexion's and Pharmaspectra's rights will be somehow impaired if they themselves had "claim[ed] an interest relating to the subject of the action."  Rule 19(a)(1)(B).  They have not done so, and the law is clear that Moulding may not claim an interest on their behalf.  *Peregrine*, 89 F.3d at 49 ("It is the absent party that must 'claim an interest'").  Accordingly, the Court can reject this argument without more.

But there is more:  Moulding *admits* that Inflexion's and Pharmaspectra's joinder is not feasible (Moulding Br. at 28), meaning that the Court would have to determine whether the action can proceed without them under Rule 19(b) in any event.  The factors outlined in Rule 19(b) favor allowing this action to proceed: the Court can include "protective provisions" in any order it issues

or otherwise "shape the relief" to make it clear that the Court's rulings are not binding on Inflexion or Pharmaspectra for purposes of their rights under the BPA and APA, and the Court can certainly render an "adequate" judgment solely against Moulding, *because Plaintiff seeks damages only from Moulding*. Fed. R. Civ. P. 19(b)(2), (3).

As for Moulding's argument that the UK Tax Authority is "necessary" to Plaintiff's indemnification claim because he is subject to the possibility of a "double" obligation to both the UK Tax Authority and Plaintiff, this is another nonsense argument. Moulding apparently does not understand the nature of indemnification. At issue is one liability, which is due and owing to the UK Tax Authority and which Moulding will have to indemnify if Plaintiff is made to pay it directly. Moulding does not explain how it is he might end up paying this liability twice, unless his argument is meant to be an admission that he does, in fact, owe this liability directly to the UK Tax Authority himself. If that is the case, Moulding should just come out and say so, rather than wasting Plaintiff's or the Court's time.

## IV.     PLAINTIFF HAS STATUTORY AUTHORITY TO MAINTAIN THIS ACTION

Moulding argues that Plaintiff is barred by N.Y. Limited Liability Company Law § 808 from maintaining this action because its registration to do business in New York lapsed after this suit was filed. (Moulding Br. at 30-31). But Section 808 only applies to LLCs "doing business in the state." N.Y. Limited Liability Company Law § 808(a). Moulding concedes that Plaintiff does not do any business in the state. (Moulding Br. at 2, 10, 23 n.15; *see also* Compl. ¶ 6). These repeated admissions confirm that Section 808, on its face, does not apply. *See, e.g., Jefferson Bus. Interiors, LLC v. East Side Pharmacy, Inc.*, 2016 WL 164043, at *2-3 (N.Y. Sup. Ct. Jan. 8, 2016) ("where a foreign company without authority is not 'doing business' in New York, it may maintain an action in this state").

In any event, if the Court were to conclude that valid New York registration is required,

that would not warrant dismissal but, at worst, a stay until the issue is corrected. *See Basile v. Mulholland*, 73 A.D.3d 597, 597 (1st Dep't 2010) (a temporary lapse in registration "is not a fatal jurisdictional defect" and the action can proceed once "such certificate has . . . been obtained."); *Manhattan Fuel Co. v. New England Petroleum Corp.*, 422 F. 797, 801 (S.D.N.Y. 1976) (applying equivalent statute for corporations and holding that "failure to so qualify is not a jurisdictional defect defeating the action, but . . . such a corporation (or its successor in interest) can, after commencing an action, obtain authority and thereafter maintain the lawsuit"). Thus, even if Section 808 applied here, dismissal would not be warranted.[3]

## V.    PLAINTIFF HAS ADEQUATELY STATED EACH CAUSE OF ACTION

### A.    Plaintiff Has Adequately Pled a Breach of Contract Claim

#### 1.    The Confidential Settlement Agreement And BPA Have no Bearing on Plaintiff's Claim

Moulding's primary argument regarding breach of contract is that the Confidential Settlement Agreement "extinguished" the Employment Agreement and, with it, Plaintiff's claims for any breaches that accrued prior to the execution of the Settlement Agreement. (Moulding Br. at 31-33). Yet again, Moulding is wrong.

The termination of a contract does not typically preclude a suit for a breach of contract that occurred prior to termination. *See, e.g., G.V. Trademark Invs., Ltd. v. Gemini Shirtmakers, Inc.*, 1999 WL 61808, at *2 (S.D.N.Y. Feb. 10, 1999) ("We reject th[e] assertion" that by "terminat[ing]

---

[3] Although Moulding does not argue that Plaintiff's temporary lapse of registration in Delaware, which has now been rectified, has any effect on Plaintiff's ability to maintain this action, he does mention that lapse (Moulding Br. 2, 10) and attached several exhibits regarding that issue. (Moulding Br. Exs. 2-3). It is not clear why, in addition to consuming additional pages in his oversized brief, Moulding burdened the Court with these extra exhibits. But because Moulding did so, Plaintiff feels compelled to note that, "upon the reinstatement of the corporation [under Delaware law,] it regains the ability to prosecute actions on its behalf and *any action taken while its charter was voided is ratified*." *Super Am. Tissue, Inc. v. Global Equip. & Mach. Sales, Inc.*, 2019 WL 6211709, at *4 (S.D.N.Y. Nov. 21, 2019) (emphasis added) (brackets in original).

the licensing agreement, [plaintiff] forfeited its rights to collect the guaranteed payments that would become due" under the contract); *William C. Atwater & Co. v. Panama R. Co.*, 246 N.Y. 519, 523-24 (1927) (under the language of the contract, "it is evident that the plaintiff had not the remotest intention of releasing any claims against defendant for damages for breach of contract which had accrued at the date of the expiration of the agreement and that the defendant could not reasonably have so understood the language thus used").

Here, Moulding relies upon Sections 2-3 of the Settlement Agreement, which provide, in their entirety:

> ***End of Employment.*** Your employment with the Employer will end on October 4, 2019 ("Separation Date").  You must not sign this Agreement before your Separation Date. Regardless of whether you sign this Agreement, you will receive your final pay including accrued and unused vacation and all outstanding amounts due and payable as of the Separation Date, as set forth on Exhibit A hereto, which represents the complete and final amounts owed to you by the Employer.

> ***Termination of Employment Agreement:*** Your Employment Agreement with the Employer, dated September 7, 2018 is superseded and terminated by this Agreement (including for the avoidance of doubt any right to receive payment in connection with the proposed sale and purchase of the business and assets by the Employer to Pharmaspectra US LLC and/or Pharmaspectra Group Ltd or other transaction related bonus) with the exception of your post-termination obligations, as noted in Paragraph 18 below.  The termination of your Employment Agreement includes, but is not limited to, any notice periods and equity grants contained within your Employment Agreement.

(Cohen Decl. Ex. A §§ 2-3).

Moulding's alleged breaches occurred prior to October 4, 2019, when the Confidential Settlement Agreement was signed.  By its plain language, the Agreement does not absolve or release Moulding for any breaches of the Employment Agreement committed on or before October 4, 2019.  The Confidential Settlement Agreement simply provides that the Employment Agreement is no longer in effect as of that date, and thus the parties do not owe continuing obligations to one another under the Employment Agreement after that date.  Importantly,

Moulding released Plaintiff from any claims that Moulding might have against it, but there is no reciprocal release by Plaintiff in favor of Moulding.  (*See* Cohen Decl. Ex. A § 6).

With no contractual provisions to point to in support of his untenable argument, Moulding resorts to outright deception by citing *Health-Chem Corp. v. Baker,* 915 F.2d 805 (2d Cir. 1990) for the proposition that "once the previous agreement is terminated, the only remedy becomes one for breach of the new agreement."  (Moulding Br. 32).  In fact, *Baker* concerned a preliminary "Outline of Settlement," *i.e.*, a letter of intent, which the parties followed up with a final "Settlement Agreement" that expressly superseded and replaced the initial "Outline."  *See id.* at 807-08, 811.  *Baker*'s holding that a preliminary agreement becomes unenforceable once the parties enter into the final agreement has nothing to do with this case where the parties terminated an agreement, but without releasing Moulding from claims arising prior to termination. Moulding's misrepresentation of *Baker* is unfortunate, but telling: there is no actual support for his argument.  The Court should reject it.

Moulding also trots out Section 8.5 of the BPA (Moulding Br. at 32), which provides, in relevant part, that "[t]he Warrantors agree . . . to waive any claim or remedy or right which it may have in respect of any misrepresentation, inaccuracy or omission in or from any information or advice supplied or given by such employee for the purpose of assisting the Warrantors in giving any warranty, representation, undertaking or covenant, in preparing the Disclosure Letter and in entering into this Agreement, or any agreement or document entered into pursuant to this Agreement."  (Dkt. No. 30-1 Ex. A § 8.5).  Here again, Moulding misrepresents that facts.

Section 8.5 of the BPA, which is part of Section 8 concerning Plaintiff's "Warranties," waives claims that the "Warrantors" (including Plaintiff) may have against Moulding (and others) based on misrepresentations given "for the purpose of assisting Warrantors in giving any warranty,

representation, undertaking or covenant," under the BPA and related agreements.  (Dkt. No. 30-1 Ex. A § 8.5).  In other words, if Inflexion were to sue Plaintiff for a breach of warranty under the BPA, Plaintiff could not then turn around and sue Moulding for his role in giving that warranty. This provision – in the *Warranties* section of the BPA – clearly did not waive all claims against Moulding for misrepresentations made *to* Plaintiff independent of those warranties.

And, even if Section 8.5 could be read to apply to Moulding's misrepresentations to Plaintiff, a release procured by fraud is invalid and does not bar claims at the pleading stage.  *See, e.g., CMG Holdings Group v. Wagner*, 2016 WL 4688865, at *8 (S.D.N.Y. Sept. 7, 2016) ("CMG pleads pervasive and particularized allegations of fraudulent behavior by Wagner . . . .  Because CMG has adequately alleged that the releases in the Release Agreements were the products of fraudulent inducement, those releases do not bar claims against Wagner at this stage"); *see also Weinraub v. Int'l Banknote Co.*, 422 F. Supp. 856, 860 (S.D.N.Y. 1976) ("it would be manifestly unfair to dismiss a claim on the strength of a release which was obtained as a result of the very fraud complained of" (internal quotation marks omitted)).  Here, as alleged in the complaint, Moulding fraudulently lured Plaintiff into signing the agreement that includes the waiver. Accordingly, even if the clause applied to Plaintiff's claims, Moulding cannot rely upon the clause at the pleading stage to avoid his own culpability.

### 2.   Plaintiff Has Pled All of the Essential Elements of Its Claim

The elements of a breach of contract claim are (1) the existence of a valid contract; (2) plaintiff's performance; (3) defendant's breach; and (4) resulting damages.  *Mercator Corp. v. Windhorst*, 159 F. Supp. 3d 463, 469 (S.D.N.Y. 2016).  Plaintiff has pled all of these elements.

First, Plaintiff has pled the existence of a valid contract, the Employment Agreement. (Compl. ¶¶ 27-32, 131-32).  Second, Plaintiff pled that it performed under the contract, including by compensating Moulding as part of his employment with Plaintiff.  (*Id.* ¶¶ 133-34).  Third,

Plaintiff alleged that Moulding breached the Agreement by engaging in fraud and self-dealing, sharing Plaintiff's private, confidential information with Inflexion, and conspiring with Inflexion to disadvantage Plaintiff in the Inflexion Sale.  (*Id.* ¶¶ 44-56, 62-63, 67-69, 73-77, 86-91, 135). Fourth, Plaintiff alleged that it was damaged by Defendant's breaches.  (*Id.* ¶ 136).

Moulding argues first that Plaintiff failed to perform because it did not pay Moulding all he was entitled to under the Employment Agreement.  (Moulding Br. 33-34).  This conclusory assertion is contrary to the allegations of the Complaint (Compl. ¶¶ 133-34), so the Court should not credit this argument at the pleading stage.  To the extent Moulding relies upon the Confidential Settlement Agreement, that Agreement simply confirms that Moulding *was paid* the amounts set forth therein.  (*See* Cohen Decl. Ex. A §§ 2-3 and Ex. A).

Moulding also claims that Plaintiff did not adequately allege damages, asserting without explanation that the damages allegations are "conclusory."  (Moulding Br. at 33-34).  That argument ignores the Complaint, which alleges that Moulding's breaches of the Employment Agreement cost Plaintiff millions in lost opportunity from other potential buyers of Plaintiff's assets, and by providing Inflexion with an advantage in the parties' negotiations so that Inflexion could negotiate better terms for itself, at Plaintiff's expense.  (Compl. ¶¶ 44-56, 62-63, 67-69, 73-77, 86-91, 136).  Similarly, contrary to Moulding's assertion that the allegations regarding the disclosure of confidential information were "conclusory" and not linked to damages (Moulding Br. 34), Plaintiff's allegations specifically tie the disclosure of confidential information to Inflexion's bolstered negotiating position, which resulted in harm to Plaintiff through the worsened deal terms. (*Id.* ¶¶ 52-56, 73-76, 136).  Plaintiff's damages allegations more than satisfy the Rule 8 standard.

### B.    <u>Plaintiff Has Adequately Pled a Breach of Fiduciary Duty Claim</u>

Plaintiff's cause of action for breach of fiduciary duty is also well-pled.  "The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing

breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Communs., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).  "Employees owe a fiduciary duty to their employers, which prevents them from engaging in self-dealing at the employer's expense." *Alpine Group, Inc. v. Johnson*, 2002 WL 10495, at *7-8 (S.D.N.Y. Jan. 3, 2002); *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *9 (S.D.N.Y. May 12, 2020) ("officers and directors owe a fiduciary duty to the corporation and its shareholders").

Here, Plaintiff has alleged the existence of fiduciary duties owed by Moulding to Plaintiff by virtue of Moulding's role as CEO of Plaintiff.  (Compl. ¶¶ 27, 139-40).  Plaintiff has further alleged that Moulding engaged in self-dealing, at Plaintiff's expense, to lure Plaintiff into the transaction with Inflexion and then undermine Plaintiff's position in that transaction to enrich Moulding and his future employer (Inflexion).  (Compl. ¶¶ 142-44).  Plaintiff alleges that Moulding even admitted his conflict of interest after the fact.  (*Id.* ¶¶ 114, 145).  Plaintiff has also alleged damages flowing from these breaches, including the lost opportunity associated with other potential buyers of Plaintiff's assets, Plaintiff's reduced payouts in the transaction with Inflexion as a result of Moulding's conduct, and excessive, unjustified payments to Moulding that he negotiated for himself as part of the transaction with Inflexion.  (*Id.* ¶¶ 146-47).

Moulding's primary argument is that Plaintiff's breach of fiduciary duty claim is duplicative of Plaintiff's breach of contract claim.  (Moulding Br. at 35-37).  Moulding is wrong. Plaintiff's allegations involve "broad alleged breaches of fiduciary duties" that "do not relate solely to obligations arising from the provisions of the" Employment Agreement.  *Kulick v. Gamma Real Estate LLC*, 2021 WL 918555, at *8 (S.D.N.Y. Mar. 10, 2021) (internal quotation marks omitted) (quoting *Trahan v. Lazar*, 457 F. Supp. 2d 323, 349 (S.D.N.Y. 2020)); *Zurich American Life Insurance Co. v. Nagel*, 2021 WL 2021 WL 1877364, at *4 (S.D.N.Y. May 11, 2021) ("Under

New York law, employees owe fiduciary duties to their employers, independent of any contractual duties, and some such duties survive termination . . . .  Nagel's fiduciary duty not to misappropriate and utilize confidential information is similar to, but independent of, the specific promises Nagel made in the contract, so this claim is not duplicative of the breach of contract claim"); *CBS Corp. v. Dumsday*, 268 A.D.2d 350, 352 (1st Dep't 2000) (permitting both breach of employment agreement and breach of fiduciary duty claims to proceed, and holding that, in addition to contractual duties, "an employee is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties'"); *Madelblatt v. Devon Stores*, 132 A.D.2d 162, 167-68 (1st Dep't 1987) (reversing trial court's dismissal of breach of fiduciary duty claim because "the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself"); *JPMorgan Chase Bank, N.A v. IDW Group, LLC*, 2009 WL 321222, at *12 (S.D.N.Y. Feb. 9, 2009) ("dismissal is not appropriate [where] it is 'reasonable to infer, under the liberal pleading standard of Rule 8, that the claim[] for . . . breach of fiduciary duty [is] based, at least in part, on facts other than those alleged in the breach of contract claim[s]'").  Here, Moulding's fiduciary duty not to engage in self-dealing to benefit himself at Plaintiff's expense is separate from his contractual duties not to injure Plaintiff or disclose Plaintiff's confidential information.  The claims are not duplicative.

Beyond that, Moulding is trying to have his cake and eat it too: he argues that the Employment Agreement is null and void, and thus that Plaintiff cannot bring a breach of contract claim (Moulding Br. at 31-33), while simultaneously arguing that the Employment Agreement is not only valid, but is so "comprehensive" that it bars Plaintiff's breach of fiduciary duty claim.

(Moulding Br. at 35-37).  Moulding cannot have it both ways.  *Cf. Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) (tort claim normally barred by contract can proceed where "the Parties have not agreed that a single, enforceable contract governs their dispute"); *Gladsky v. Frank Scobbo Contractors, Inc.*, 2017 WL 3731323, at *5 (E.D.N.Y. Aug. 29, 2017) ("Where, as here, there is a dispute whether a valid and enforceable contract exists between the parties, the [tort] claim should not be dismissed").

Moulding also argues that Plaintiff has not adequately pled damages flowing from the breach (Moulding Br. at 37), but this argument fails because Plaintiff has alleged, explicitly and in detail, how it was damaged.  This is not a case where Plaintiff is claiming damages based on potential future profits, as in the cases mentioned by the Second Circuit in the dicta cited by Moulding from *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 244 (2d Cir. 2020).  Moulding injured Plaintiff by scuttling potential deals with other buyers that had specific dollar amounts tied to them (Compl. ¶¶ 41, 63) and, even setting aside these lost opportunities, negotiated a deal that would enrich him and his future employer, at Plaintiff's expense, which translated to millions of dollars *actually lost* for Plaintiff.  (Compl. ¶¶ 44-56, 62-63, 67-69, 73-77, 86-91, 146-47).  There is nothing "speculative" about these allegations.

### C.  Plaintiff Has Adequately Pled an Unjust Enrichment Claim

Plaintiff has also properly asserted a claim for unjust enrichment.  The essential elements of an unjust enrichment claim are that: (1) that defendant was enriched; (2) at plaintiff's expense; and (3) "equity and good conscience require defendants to make restitution."  *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007).

Plaintiff has alleged each of those elements here.  Moulding enriched himself at Plaintiff's expense by arranging a sale of Plaintiff's assets to Moulding's future employer, Inflexion, and then negotiating an excessive equity payout in connection with that deal.  (Compl. ¶¶ 116-27).  Because

Moulding took advantage of his position of trust with Plaintiff and improperly utilized confidential information in order to enrich himself, equity and good conscience require that he make restitution. *See, e.g., Gov't Emples. Ins. Co. v. Damien*, 2011 WL 5976071, at *5 (E.D.N.Y. Nov. 3, 2011) (unjust enrichment pled where defendant "took advantage of [employer's] system for his own enrichment"); *Vlachos v. Thomas*, 2018 WL 3158515, at *4 (N.Y. Sup. Ct. June 28, 2018) (unjust enrichment claim "viable" where plaintiff alleged "that defendants took advantage of him").

Moulding's argument in response is that the Confidential Settlement Agreement precludes this claim. (Moulding Br. at 37-39). He is wrong. As set forth above, the parties dispute whether the Confidential Settlement Agreement precludes claims against Moulding. There is no release by Plaintiff in favor of Moulding in the Confidential Settlement Agreement. (*See* Cohen Decl. Ex. A § 6). Nor does the Confidential Settlement Agreement state that Plaintiff was required to make this payment, and Plaintiff has expressly alleged that it was a discretionary payment. (Cohen Decl. Ex. A §§ 2-3 and Ex. A; Compl. ¶¶ 116-27). Moulding's contention that Plaintiff released all claims against Moulding relating to the Equity Incentive Payment has no basis. (Moulding Br. at 37-39). At most, this argument presents a disputed issue of fact that cannot be resolved at the pleading stage. Accordingly, Plaintiff's unjust enrichment claim should stand.

## D.   Plaintiff Has Pled Its Fraud Claims With The Requisite Particularity

To state a claim for fraud, a plaintiff must allege "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) The allegations supporting a fraud cause of action "must satisfy the heightened pleading requirements of Rule 9(b) by stating the circumstances constituting fraud with particularity." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481,

491 (S.D.N.Y. 2020).  However, "Rule 9(b)'s heightened particularity requirement does not apply to allegations regarding fraudulent intent, also known as scienter, *which may be alleged generally*." *Id.* (emphasis added).

At bottom, a plaintiff must plead "the who, what, when, where and how of the alleged fraud." *Minnie Rose LLC v. Yu,* 169 F. Supp. 3d 504, 511 (S.D.N.Y. 2016).  "[A] plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *Rana v. Islam,* 305 F.R.D. 53, 58 (S.D.N.Y. 2015).

Here, Plaintiff pled the who (Moulding); the what (specific false statements regarding Inflexion, Inflexion's bid, the due diligence process, and revenue information); the when (each of the statements are tied to dates, including statements made in February 2019; March 2019; April 2019; August 2019; and October 2019); and the where and how (in-person and telephone communications with Plaintiff in New York).  (Compl. ¶¶ 48, 51, 62, 67, 87, 89, 92-93).  Plaintiff further alleged that Moulding knew that these statements were false based upon, *inter alia*, his discussions with Inflexion, and that he made them "[i]n order to sway Plaintiff" into agreeing to a transaction with Inflexion for Moulding's own benefit.  (*Id.* ¶¶ 47, 50, 62, 63, 68, 87, 88, 159-60).

Moulding concedes that the Complaint "includes some the [sic] requisite information, including the month, mode, and general statement [sic] allegedly stated by Mr. Moulding." (Moulding Br. at 40).  In other words, Moulding concedes that Plaintiff met the pleading standard. Moulding nonetheless argues, apparently in earnest, that this "is not enough."  (*Id.*)

According to Moulding, the missing piece is "particularized facts to support the inference that the defendant[] acted . . . with fraudulent intent."  (*Id.* (internal quotation marks omitted)). That argument ignores Plaintiff's allegations that Moulding acted with the requisite scienter, with

supporting facts showing why Moulding knew his statements were false and why he wanted to induce Plaintiff's reliance.  (Compl. ¶¶ 47, 50, 62, 63, 68, 87, 88, 159-60).

Moulding then argues that statements about the future are not actionable.  (Moulding Br. at 41-42).  But most of Moulding's misstatements were about existing facts, such as Inflexion's cash-on-hand, whether Inflexion had offered the highest bid compared to other, actual bidders, or whether Plaintiff had met certain revenue targets.  (Compl. ¶¶ 48, 51, 62, 67, 87, 89, 92-93).  To the extent any statements were about the future, they are actionable because Plaintiff alleges that Moulding knew the statements were false when he made them (*id.* ¶¶ 47, 50, 62, 63, 68, 87, 88, 159-60), *i.e.*, Plaintiff has alleged precisely the "intent not to perform at the time the promise was made" that Moulding claims is required.  (Moulding Br. at 41 (internal quotation marks omitted) (quoting *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994)).

Moulding also suggests that because the fraud was "obvious," Plaintiff had an obligation to "ferret out the reliability or truth."  (Moulding Br. at 41).  This extraordinary (and conclusory) argument assumes, contrary to the Complaint, that Moulding's fraud was "obvious" at the time.  It also ignores that Plaintiff was entitled to reasonably rely upon representations made *by its own CEO* without having to investigate whether he was telling the truth.  *See DeDalle v. A.G. Edwards & Sons, Inc.*, 804 F. Supp. 436, 440 (D. Conn. 1992) (duty to investigate "requires not only that facts demonstrating the fraud be available to plaintiff, but also that plaintiff have some indication that he has been defrauded" before plaintiff is "obliged to inquire further"); *cf. Varbero v. Belesis*, 2020 WL 5849516, at *7 (S.D.N.Y. Oct. 1, 2020) (there must be "a basis for imputing knowledge of the fraud in the absence of circumstances that would require the plaintiff to investigate").

### E.      Plaintiff Has Adequately Pled a Civil Conspiracy Claim

As Moulding correctly notes (Moulding Br. at 42), to state a claim for civil conspiracy, a plaintiff must allege "(1) an agreement among two or more parties, (2) a common objective, (3)

acts in furtherance of the objective, and (4) knowledge." *Diamond State Ins. Co. v. Worldwide Weather Trading LLC,* 2002 WL 31819217, at *4 (S.D.N.Y. Dec. 16, 2002).

Plaintiff has pled all of these elements. It alleges an agreement between Moulding and Inflexion. (Compl. ¶¶ 44, 56, 75-76, 167). Plaintiff alleges that they shared the common objective of disadvantaging Plaintiff in the transaction with Inflexion. (*Id.* ¶¶ 44, 56, 75-76, 167). Plaintiff alleges that Moulding took acts in furtherance of that objective, sharing confidential information with Inflexion and making misrepresentations to Plaintiff. (*Id.* ¶¶ 44-56, 62-63, 67-69, 73-77, 86-91, 168). Plaintiff also alleges that Moulding acted with knowledge. (*Id.* ¶¶ 44, 47, 50, 56, 62, 63, 68, 75-76, 87, 88, 159-60, 169).

Moulding faults Plaintiff for not pleading the claim with particularity by alleging, for example, "specific times." (Moulding Br. at 43). Setting aside the fact that the specifics of Moulding's agreement with Inflexion are in Moulding's possession, the "pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)." *M.E.S., Inc. v. Safeco Ins. Co. of Am.*, 2014 WL 2931398, at *13 (E.D.N.Y. June 27, 2014) (citing, *inter alia*, *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990)). Plaintiff alleged Moulding's fraudulent conduct with particularity as set forth above, and pled more than enough facts about the conspiracy to satisfy Rule 8.

Moulding also complains that the cause of action is "duplicative." (Moulding Br. at 43). Not so. The claim requires the pleading of an "independent, actionable tort," so there obviously must be some overlap with other claims in order to state a conspiracy claim. *See, e.g., Food Holdings, Ltd. V. Bank of Am. Corp.*, 477 F. Supp. 2d 602, 613 (S.D.N.Y. 2007). Moreover, Plaintiff's other causes of action are grounded in Moulding's independent breaches of contractual and legal obligations that have nothing to do with Inflexion, and Moulding would be liable under

those counts whether or not he was coordinating with Inflexion.  This civil conspiracy claim, by contrast, is specifically based upon Moulding's entering into an agreement with Inflexion to harm Plaintiff, and then taking steps in furtherance of that improper agreement.  There is nothing duplicative about it.[4]

### F.   Plaintiff Has Adequately Pled Tortious Interference Claims

To allege tortious interference, "a plaintiff must allege that: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Brown Media Corp. v. K & L Gates, LLP,* 586 B.R. 508, 529 (E.D.N.Y. 2018) (citing *Catskill Dev., LLC v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir. 2008)).

Moulding first argues that Plaintiff failed to identify the parties with whom Plaintiff would have entered into a business relationship but for Moulding's misconduct.  (Moulding Br. at 45).  Then he immediately contradicts himself by admitting that, in fact, Plaintiff alleged the "named and unnamed potential buyers," specifically identifying Silversmith Capital, Spectrum, Summit Partners, and Bridgepoint and even identifying the dollar value of those potential transactions that were scuttled due to Moulding's interference (up to $90 million).  (Moulding Br. at 45; Compl. ¶¶ 41, 63, 175, 177).  Needless to say, Moulding has no response to the foregoing.

Faced with this reality, Moulding falls back on the argument that the tortious interference claims fail because Plaintiff failed to plead its other underlying torts.  As described at length above, Moulding is wrong about that.  The tortious interference claims are properly pled.

---

[4] As noted above, a co-conspirator is not a "necessary party" for purposes of Rule 19.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Moulding's motion to dismiss in its entirety.

Dated:  June 14, 2021

Respectfully submitted,

SEYFARTH SHAW LLP

By:  */s/ Jeremy A. Cohen*
         Jeremy A. Cohen (JC-6602)
         Owen R. Wolfe (OW-1931)
         Claire A. Bjerke (SDNY admission
         pending)
         620 Eighth Avenue
         New York, New York  10018
         Telephone: (212) 218-5500

*Attorneys for Plaintiff PS US LLC*